Case number 12-5368 with 67 additional consolidated cases. Enri Darvocet et al. Anise Germain et al. v. Keith Brumfield et al. Court of argument not to exceed 15 minutes per side. These 15 minutes are to be shared by the defendants. Mr. Bograd for the appellants. Good morning. May it please the court, Louis Bograd for appellants. These consolidated appeals raise numerous issues concerning defendants' liability for injuries caused by propoxyphine. Given our limited time, I'd like to focus on three issues this morning. First and most important is the issue raised by the Supreme Court in footnote 4 in its recent Bartlett decision. Wouldn't preserved rather than raised be more accurate to describe what they did in that case? They didn't reject it. Right. They raised, they identified the issue as an issue that they were not reaching. And we don't, Your Honor, we certainly don't dispute that the court did not reach that issue. In fact, I think the footnote quite clearly says that. But the court explicitly said that the decision they were rendering in Bartlett did not resolve that question. And unlike Bartlett, unlike Mensing, these cases squarely present that issue. Because there's a fundamental difference between propoxyphine and the drugs at issue in those cases, sulindac and metoclopramide. And that fundamental difference is that the FDA agrees that the drug is unreasonably dangerous and has pulled it from the market. Today? Today. But there are factual questions, Your Honor, about whether we would be able to establish the footnote 4 defense. And I'd be happy to discuss those. But the fundamental difference. The prerequisite of that, you still are relying on significantly new information. To me, the common sense point they're reserving, and it seems all nine justices agree with it, which makes it even more likely to be common sense, is just the situation where the FDA has done its studies, it's regulated up to a certain point, say July of 2009, and then the next month this devastating study comes out. And all that's going on for these parallel claims is you can't say, well, we're going to wait until the FDA acts before someone's liable. But I assume it's something pretty catastrophic that comes out. It's so dangerous to health, and then new and scientifically significant info not before the FDA. And so I don't even see that in your case. So I don't even know. Well, Your Honor, you don't see much of anything in our case because the judge never let us get anywhere in the case. These cases were dismissed on the pleadings. I don't see it in the complaint. Well, the complaint contains a lot of information. The complaint relies on post-09 information? Your Honor, I don't believe the footnote 4 argument is limited to post-July 2009. Well, then you should maybe respond to my way of thinking about footnote 4. All I'm thinking it means is up to July of 2009, I'm using these facts, but we have this certain base of knowledge as to the dangerousness or lack of dangerousness for this drug, and then suddenly something new comes out. You've got to do something under state or federal law. Exactly right, Your Honor, and I think what the FDA said to the court in Bartlett is that when there's new information that comes out that the FDA hasn't, that's new and scientifically significant, that was not part of the FDA review, and that leads to a recalculation of the risk-benefit analysis so that it's no longer clear that the drug is safe, then a stop-selling theory of tort liability makes sense, because both federal law and state law prohibit the sale of an unreasonably dangerous drug. It's misbranded under federal law, and therefore its sale is prohibited, and it violates various state tort theories. You have to remember the facts here, Your Honor. The Darvon was approved by the FDA in 57, I believe Darvoset in 72. Go back to your complaint. What does it say about post-July 2009 information? It doesn't say much of anything about post-July information other than the study that Xanadine conducted that led to the product being pulled from the market. Our contention, Your Honor, is that even before July 2009, there was new and significant information that had not been considered by the FDA when it approved the drugs, new and significant information that had not been considered by the FDA when it approved generic versions of the drugs, and in some cases new and significant information the FDA did not consider even in its 2009 review, and that that information, remember in 2005, the British government said that they can't find any patient group in which the risk-benefit for this drug is positive. There is information from long before 2009 that the defendants are attempting to hang their hat on this 2009 review, which, as you will recall, at which time the advisory committee actually recommended the drug be pulled from the market, but the information that was available even before then was sufficient to render the drug misbranded under federal law, and indeed the FDA in 2009 recognized that... Does the advisory committee's recommendation mean anything here? Well, I think it's important evidence, Your Honor. It's not, I mean, obviously they're not the regulatory body with authority, but the FDA itself concluded that the drug was misbranded in 2009 when it ordered stronger warnings, including a black box warning, including warnings specifically about cardiac treatment, so that all of those, you know, the FDA did not come to the conclusion that everything was hunky-dory in July 2009 and say we don't have to worry about this drug, it's safe and effective. So they upgraded the warnings and the generics had to follow the upgrade? What I'm saying, Your Honor, is the generics were selling, and we'll turn to the Fulgenzy question in just a second, what I'm saying is as a matter of design defect law, we think there was evidence that the FDA didn't consider, and indeed public citizen petitioned the FDA to reconsider its action on the citizen petition in 2009 because it had failed to consider important scientifically significant information out there. There was information. We will need to establish that there was new and scientifically significant information that the FDA did not consider that rendered the drug. Do you need to or you don't need to? We do need to. We will need to prevail in this case, and remember we're up on motions to dismiss. To prevail in this case we're going to need to establish that there was new and scientifically significant information that the FDA didn't consider that rendered the drug misbranded under federal law. And to prevail on this appeal you have to show that that's alleged in the complaint. And it is alleged in the complaint, Your Honor. Paragraph 301, I believe it is, has lengthy allegations about the drug being misbranded under federal law. It also contains lots of allegations about the factual findings made by the European Drug Agency, the British Drug Agency. There's plenty of them. It doesn't have to be new, though, as to 2009. It just has to be new as to... It has to post-date the FDA approval of the product, in the sense that it has to be information that has not been reflected. If the FDA has made a professional judgment that, despite that information, the drug can be on the market, the defendant is allowed to rely on it. If there's information the FDA has not considered under footnote four, that can be a basis for pulling the product from the market. And I think there's a reason that you haven't... Is that consistent with the theory of the amicus brief that this footnote was supposedly responding to? Yes, it is, Your Honor. I believe it is. I think we'll have to wait to get the FDA's views on this question. But the FDA says that where the product is misbranded under federal law, a state design defect or other state stop-selling wrongful marketing theory can survive. They said in the case in Bartlett there was no new scientifically significant information. And they may take the position that the information they considered in 2009 answers this question, and that remains to be seen. But that's a factual question for resolution, a motion for summary judgment, or a trial. It's not a basis for declaring this claim preempted and unavailable at the beginning of the litigation. I'm sure I'm missing something. So this means that under this reading of footnote four, if there was enough before 2009 that you could go after a brand name under state law, you're always going to be able to go after the generic under this theory. Isn't that right? Well, remember, Your Honor, that in most cases the vast majority of state tort litigation against drug companies involves failure to warn. And Mensing clearly speaks to the question of failure to warn liability. But there is going to be a theory out there under state law under this parallel approach to your interpretation of footnote four. That is correct, Your Honor. But you can't always make generics liable when brands are liable. There can't be a state in the country that you wouldn't have some common law or something claimed. That just seems to be ingenious, but it's so inconsistent. I apologize for interrupting. That's not true. There are states, for instance California, Washington, and Utah, I believe, that apply comment K across the board. So they basically preclude all design defect liability against drug companies because they say all approved pharmaceuticals are unavoidably unsafe products. So there would be a question of state law. It's not clear to me that there would not be differences between the two categories. But, yes, to the extent that a drug is misbranded under federal law, then the impossibility conflict that the court identified in both Mensing and Bartlett disappears. Because if federal law prohibits the sale of a drug because it is misbranded, either because it's unreasonably dangerous or it lacks adequate warnings, then it can't be impossible for the defendants to comply with an obligation imposed by state law not to sell an unreasonably dangerous product. They stop selling. They stop selling, which complies with both their duties under state law and under federal law. It seems like a great argument for the court. It seems that it asks a lot of a junior varsity court. Well, Your Honor, we may well have to ask them to consider it if you're unwilling to agree with our reasoning. But it seems to me to follow like night follows day from the inherent logic of the court's impossibility preemption reasoning. I think it's like a leap year claim. Well, and I think this is a leap year case, Your Honor. As I said, most drugs are not so dangerous or so inefficacious that they get pulled from the market as unreasonably dangerous. I mean, this was a case, Darvon is a case, where you've got a drug that basically didn't do anything except hurt people. It was prescribed for mild to moderate pain. Most studies suggest it was not effective in the least. You know, Darvon with acetaminophen is effective, but that's because it's got acetaminophen in it, and there's no evidence that Darvon plus acetaminophen was any more effective. You should talk about that. I would like to, Your Honor. I see that I'm a bit, would you rather I reserve that for rebuttal or talk about it? I'd rather you take a few minutes and discuss it. Okay, let me do that. The two other issues I want to touch on briefly, Your Honor. The first is the Fulgenzy issue, the failure to update issue. In the Fulgenzy case, this court has decided, like many courts around the country, that the failure of a generic drug company to provide a warning that matches the warning that the FDA has approved on the brand is a viable claim, failure to warn claim, unpreempted after mensing. After what? After mensing versus mensing. That it's an exception to the preemption rule under mensing where plaintiff contends that the generic didn't provide the warning that federal law required and contends that the failure to provide that warning caused his or her physician to prescribe the drug that they would not otherwise have prescribed, that that states a valid cause of action. Judge Reeves didn't dispute, well, he did dispute, but that's because he was writing before Fulgenzy came down. Judge Reeves threw those claims out primarily on pleading grounds. He said, well, we haven't bothered to allege which generics didn't make this, didn't fail to update their warning labels. That's incorrect, as you'll see if you look at paragraph 96 in the Alex complaint as representative, we said the generic defendants did not timely implement the black box warning, and that's because if you look at the FDA website that lists warning labels and approved amendments to warning labels, there was no indication on that website that any generic had made the change. Now, in their briefs, the generic defendants now tell us, provided evidence that one Mylan product had an updated label. We're not disputing that if, in fact, this updated labeling was changed and provided that there's no cause of action, but we did allege that none of the generic defendants make this change, and we allege that that was the cause of, and we did so on a reasonable factual basis, and we said that was the cause of. Briefly do your third issue now. Sure. The third issue, Your Honor, which I'll just touch on briefly, is the brand liability issue. Obviously, this is a huge, all-encompassing issue. It involves 22 different state laws, and the court has expressed its view on this issue in at least Tennessee and Kentucky law. I think the important question here, Your Honor, this kind of litigation almost invariably takes place in federal court. This is a pure question of state law. Plaintiffs find themselves in a bind where federal courts are reluctant to address unresolved state law questions, and as they perceive make new law, we think our misrepresentation claims are well-grounded. What is the misrepresentation? Well, Your Honor, there are several, but if the misrepresentations are in the labeling, the label suggests that propoxyphene is an effective pain reliever. Untrue. It suggests that propoxyphene plus acetaminophen is superior to other forms of pain relief, such as acetaminophen alone. Untrue. It suggests that the drug is safe and effective when used in accordance with ordinary dosages. Untrue. These are all misrepresentations that exist in the labeling. That's strange. I mean, you can make misrepresentations about a competitor's product and be sued even though you're not selling the product. But if the misrepresentation is on the product you're selling, it seems like you're only liable for the product you sold. I mean, that's just really odd to me, and it just seems like putting a new label on traditional product liability warranted claims. Well, Your Honor, I disagree, and obviously, as we've said in the brief, there are at least a few courts that agree with us in Alabama, California, Illinois, Vermont. The premise is that it's traditional blackletter tort law, that you can make a misrepresentation and be held liable for it if it is reasonably foreseeable that someone is going to rely on that misrepresentation and suffer harm as a result. It is absolutely reasonable to foresee that when a drug, a branded drug company makes a representation to a physician about the chemical element that they sell, that that representation is going to lead to… …is about drawing sensible lines, and this just seems like an area where the line is so sensible at the end of who's selling it. Well, Your Honor, that… You're not misrepresenting about someone else's products. You're misrepresenting about your own. Well, you're misrepresenting about the effect of a drug, and you know that 80% of the time that a doctor writes a prescription for that drug, it's going to be filled with a generic copy. So it is entirely foreseeable that your representations… And remember, it's the branded companies that publish their label in the physician's desk reference. The generics typically don't. It's, you know, the whole system is structured so that doctors rely on…  That's why we know there are thousands of people that buy whatever Warren Buffett buys just because he bought it. He's liable when these other fools buy the stock because he makes a misrepresentation about why he bought it. Well, I guess we could fight about whether it was reasonable for them to rely on that representation. But, yeah, I mean, if he makes… If someone makes an affirmative… And just to be clear, Your Honor, there are lots of cases in which we hold a manufacturer liable for… for product liability at the same time that we hold another party liable under a different tort theory. We often hold doctors liable for malpractice at the same time that we hold, you know, drug or device manufacturers liable for product liability. So it's not… This isn't a new theory, but the point I wanted to emphasize, Your Honor, we moved in the district court in many of these cases to certify this question to the state supreme courts. We've moved in, I believe, a few of the cases here for certification. It seems to me that the Alabama Supreme Court, I think it would be fair to say, surprised everyone when it, by a vote of 8 to 1, upheld this legal theory and said we agree that plaintiffs can sue brand manufacturers. I don't think courts, federal courts, can fairly assume what it is that state supreme courts are going to do. Our job is to anticipate what each of these state courts would do. It is, Your Honor, but you also have a procedure available to you to ask those state courts what to do. I understand, for some of those courts. Which of the 22 states does the law look clearest in your direction? Well, Your Honor, there is now a federal district court decision in Illinois in favor of this theory. That's the Capitano decision. Illinois would be the best, the case where we would most likely predict in your favor. Well, because in the Dolan case, which I believe we submitted to supplemental authority, because I think it came after briefing, I think it's the Northern District of Illinois, rendered a decision accepting this theory under Illinois law, and Capitano, I believe, is the only appeal. Based on state court cases, which state is strongest? I'm sorry, Your Honor, it's hard to say. As I said, we've cited you the cases that are clearly on point, as have defendants. This is reasoning from restatement provisions 310 and 311, and reasoning from black letter principles of tort law that are adopted in virtually every state. And there are no states, to the best of my knowledge, where the highest state court has rejected this cause of action. So that's why I think it is a live issue in every state, and unfortunately, because the issue is typically litigated in federal court, we find ourselves in this bind of not being able to, you know, you all feel like you can't, you don't want to presume a new legal theory that hasn't been officially recognized by the court, but we have no way to get to the state court to have the issue recognized, because defendants keep removing these cases to federal court. Thank you, Your Honor. I hope I will have a few minutes for rebuttal. How many did you reserve? I reserved three. Thank you. You've all divided it seven and seven? I think eight and seven. My colleague was generous with the extra. Ten and ten, all right. Thank you very much. Good morning, Your Honors. Jay Lefkowitz for the generic defendants. And in the time I have available this morning, I want to really frame my remarks around the questions, Judge Rogers, that you asked, and then that Judge Sutton asked, because I think they framed the issue properly. You asked two questions. You actually made an observation, Judge Rogers, at the beginning, that the court certainly didn't recognize this parallel miscrandling claim. It simply said it wasn't addressing it, and that is certainly true. But what you also asked, counsel, is what was the court responding to? Let's look at the amicus brief that the government submitted. And we talked a lot about the new evidence component, and I really want to focus primarily on that. But there's another critical component that the government articulated there, which is that in order, even if you had a federal misbranding situation, in order for a state to be able to parallel it, you'd have to have what the government called a pure design defect jurisdiction, where warnings don't play any role at all. And as the government acknowledged in its Bartlett brief just a year ago, they're not aware of any jurisdiction in the country where there are state clauses of actions under design defect that don't implicate warnings in some way or another. And, of course, in all the jurisdictions here, we have comment K issues. But then the court said, even if you were in a pure design defect jurisdiction, we would have to take into account the role of the FDA. And that's the critical question that I think Judge Sutton was driving at. And my colleague here called this a leap year case. I would say that Judge Sutton properly described this really as about an 18-month case because there are two windows here, pre-2009 and post-2009. Now, pre-2009, and this is where all of the allegations are. I looked at the allegations, the paragraph 309 that counsel suggested. There's nothing in there. 309 or 301? Oh, did he say 301? Well, I looked at the whole complaint. There's nothing post-2009 other than an acknowledgment that Xanadine was conducting a study, which I'll get to in a moment. But pre-2009, there are lots of allegations about what the United Kingdom did, what the European Committee advised. You asked a good question. What was the relevance of the FDA's own advisory committee recommendation? And, of course, the relevance is that the actual agency itself made a determination. Looking at all of that evidence, it's a determination they would like to second-guess. But it's a determination that the drug could stay on the market, indeed subject to new labeling. Well, of course, that's exactly what happens in every case where the FDA strengthens a label. That was the issue in Mensing II. And, interestingly, both the federal government, as an amicus in Mensing, and Mr. Bograd himself in the Mensing case argued to the Supreme Court that the drug was misbranded. And both federal and state law prohibited you from selling, prohibited Teva from selling a misbranded drug. The fact is it can't possibly be that we can have state causes of action that claim that something is parallel to federal misbranding when, in fact, the FDA renders a judgment that says you can stay on the market. So, really, we're not talking about a leap year. We're talking about this window after 2009. Has Judge Sutton properly recognized? Well, the complaint is totally bereft. Out of curiosity, what does happen under state and federal law after July 2009? Just hypothetically, some devastating study comes out in September of that year. How does this work? Well, the drug companies, the brand companies are obligated to monitor all the literature and to provide all the information. They have a duty to stop selling right then, right? What was that? They could have a duty to stop selling right then. They could conceivably have a duty, although then you'd be into the question of the FDA's discretion. What would happen under footnote four in generics, I mean under state law claims? What would happen there? I don't think under state law claim, I don't believe that you would have a viable cause of action. You wouldn't have a duty to stop selling if something devastating happened? Well, the question, of course, is would the generic company learn about this? Are you assuming that the generic company? One page of all the major newspapers, new study shows a third of the people die within 30 days of using this. I think if that happened, the FDA would take action. I mean, Mensing actually posited that very question. Mensing said, the Supreme Court actually said, assuming arguendo, that there is a duty by the generic company, which we know can't change the label, to actually come forward and tell the FDA right away that there's new information and that that duty flows from the misbranding statute. What Justice Thomas said in the majority opinion is even if there were that duty under the misbranding statute, it would be all sheer speculation as to what the FDA would do with that. And so therefore, you can't change the label. And as Justice Alito acknowledged in the Bartlett case, in the Mensing case itself, stop selling was also an option available to the generic company. And in fact, it was one of the bases for the lower court's opinion. But that's an interesting hypothetical, and it may be something that we'll have to litigate at some point. It's not pled here remotely. What's pled here is a series of complaints about what the information was, which the FDA actually had at its disposal in 2009. Now, post-2009, what the FDA said is, you are all permitted to continue to sell this product, subject to an ongoing study that we're directing Xanadine, the brand company, to do, and then we'll evaluate that study. And of course, when they evaluated that study, they then made a determination to suggest, they didn't actually bring a misbranding claim. They didn't declare the drug to be misbranded. They did recommend that the companies withdraw the drug, and all of them did. I think it might be a different situation if after that determination, the drug companies continued to sell the drug. You might then, assuming you met the first condition of the government's hypothetical, a pure design defect jurisdiction, you might then be in some type of situation where if footnote four were litigated, you'd have a potential issue. But we don't have a finding of misbranding. We certainly don't have any allegations of new evidence. And certainly with respect to the generics, the generics weren't even doing this study. There's no allegation that the study was made public, that anyone would have known about it. And so I think even between the 2009 and 2010 period, you're really talking about interfering with the FDA's enforcement discretion. And of course, pre-2009, you're talking about second-guessing the FDA's actual determination. So in addition to the mensing and the Bartlett concerns, there are also a series of Buckman-related concerns as well, not so much in terms of fraud on the FDA, but in terms of the other issues that the court talked about in Buckman, second-guessing the FDA, questioning the enforcement authority. Can you address the failure to update? Absolutely, Your Honor. The failure to update issue is, as Judge Reeves said in his opinion, at pages 9 and 10, a pleading issue. We understand that the Sixth Circuit in the Fulgenzi case made a determination, which I gather is now law of this circuit, with respect to in the event that there is a properly pleaded allegation of not following the federal directive, then a traditional failure to warn claim might not be preempted. The Fulgenzi court said that the Smith court hadn't actually addressed that, and so I'm not going to argue that issue today. However, there's a simple pleading defect, and the judge recognized it, and this is after the plaintiffs were given an opportunity to amend their pleadings. They amended their pleadings after this issue had been alive in mensing. Mr. Bograd actually teed this issue up in a series of letters with the Supreme Court right before the mensing case was argued, and then again the failure to update was teed up in the Smith case in this case. What do they allege? A naked allegation that says generic companies didn't update. What they don't do, first of all, is meet the standard that the Strayhorn opinion in the Sixth Circuit said needed to be satisfied in terms of identifying which companies didn't update. But even beyond that, there's an Iqbal and Twombly problem. There is no elaboration that ties this to causation. There's no allegation that, in fact, if the update had been made, a physician under the learned intermediary doctrine would have reacted any differently. There's no discussion of what was in that warning. The warnings in the black box warning that they're talking about here are warnings with respect to overdosing. The actual claim here is about a cardiac event. Different issues at all. It's not just that they didn't identify them. It's that they didn't identify the particular way in which those warnings affected the people. That's correct, Judge Ramos. You put a lot of focus on the fact that they say none of them weren't. None of them updated. That's not your argument. No. I'm willing to say that they did allege that none of them updated. I think they make an allegation that has no kind of meat on the bone in that respect. In other words, I think it's not a sufficient allegation to simply say on information and belief no one updated when there's plenty of information that was available to them to show that companies did. But the more critical problem there is an Iqbal and Twombly problem, which the judge recognized where he said this is nothing more than a sheer possibility that this failure to update, which they don't even properly allege, is linked to causation. There's two different parts of your argument. One is that they don't sufficiently allege that they didn't update, and they don't sufficiently allege how their particular non-updating had an effect on people. Those are different? They are different. What about the first one? I don't see what your argument is with respect to the first of those. Because it seems if they say on information or belief, or they don't say on information or belief, they say all of them didn't update, why isn't that a sufficient allegation? Without getting into the causation, which is your second argument that I understand. I think it would, I think, and certainly Judge Reed's pointed out, that they would have been required to at least identify which companies. They're suing a series of companies. Why doesn't that identify? Is the problem upon information and belief? No, no, no. The problem is that there's no specificity with respect to which companies are involved, and since you have to tie it ultimately to causation. But you said, you agreed that those were different parts, different steps of your argument, right? That's correct, Your Honor. And then doing the connection, right? I'm saying is there any merit to the first step? You go into the second step, it's not helping any, right? About the first step, why isn't it enough to say all of them did it or didn't do it? None of them did it. Would that be enough? It's pretty clear which ones they're talking about. They're talking about all of them. What's wrong with that argument? Okay, Your Honor, I think I would rely certainly more on the lack of causation argument. Judge Reed made, in effect, alternative determinations, and I was trying to support both of them. In closing, if I may, Your Honor, I think that you're right to point out that the Supreme Court did not address this at all. What they were responding to was a hypothetical, which the United States government actually proffered as a true hypothetical in a world that they say doesn't exist at this point. Thank you, Your Honor. You can do all 22 states right now. Excuse me, Your Honor? I'll do my best. If I'm quick, I apologize. I'm not asking you to do that. I was just asking if that was the plan. I'm joking, Your Honor. Good morning, Your Honors. Hank Bullock for the Brand Defendants. May it please the Court. I think this case boils down to one very simple fact, that the appellants themselves concede that they never at any point ingested a brand defendant's product. That fact alone is dispositive and requires dismissal of all of the claims at issue today under each of the 22 states at issue. More than 80 courts, as Mr. Bograd himself will concede, have addressed this issue, including this court on two separate occasions, in both the Smith case and the Strayhorn case, as well as five other sister circuits applying the laws of seven other states at issue today. In each of those cases that we cite in our papers, the courts dismissed the claims against the brand defendants for two separate but equally important reasons. First, no matter what name is given to the claims, they all sound in product liability. Product liability claims, by definition, require product identification, proof that the plaintiff used and that her injuries were caused by the defendant's product. That's absent here. They took someone else's product. Someone else's product caused the injuries. Second, even if the claims somehow can avoid the product identification requirement, they would still fail for the separate independent reason that the plaintiff cannot show any duty flowing from the brand defendants to warn about the risks associated with generic products to those who take competing generic products. No relationship between brand and plaintiff. No duty whatsoever for a second reason the claims fail. But some state says it's just about reasonable foreseeability. Well, Your Honor, if I could, I think that that's not the case here. And frankly, I think that this court's decisions in Smith and Strayhorn set out the proper roadmap this court's supposed to look at. I'll go to the second point first, which is duty. This court said that when determining whether a duty exists, you must first look at the state law on the issue. This court by itself can't impose or recognize a new state duty absent one being created or recognized by the state appellate courts at issue. I thought our job was to anticipate what the state would do under Erie. It is, Your Honor. If any scholar in that state would say, when this Supreme Court of our state gets this, based on all of the previous decisions of this court and the Court of Appeals decisions, it's a virtual certainty that they will rule thusly. But the state court hasn't done so. You would say we have to rule against that? That's not a fair way to predict things, is it? Well, I don't think that I would say that, Your Honor. I think this court in Smith and Strayhorn and even before that, in its Combs decision, said that. That's got to be a kind of extreme way of interpreting it. It's an extreme thumb on the scale of Erie, it would seem to me. Well, Your Honor, I would agree with you. Under Erie, this court is to predict if the specific question has not been addressed. But I think that's a far cry from what the appellants are asking you to do today. They're asking you to recognize and create, under 22 different states' laws, an entirely new duty when one has never existed in any of the 22 states at issue. And I think that's important. Well, never having existed, I suppose, would be relevant because if it never has been existed, that's because all the litigants have assumed that there was no basis for it. So the absence of its existing sort of suggests that it doesn't exist now. Or it suggests that the courts in those states have traditionally rejected the concept of the duty. And I think the case law that we cite in the brand defendant's briefs for each of the 22 states at issue suggests that when the state courts have looked at this question of whether to extend the duty beyond the traditional product liability realm, from manufacturer to those who take its products, to a completely separate manufacturer who makes a completely separate product, when each of the states at issue has been asked to expand or recognize this new expanded imposed duty, they've rejected doing so. And so I think in that respect, Your Honor, that is why, for instance, this court in Smith and Strayhorn refused to expand the duty absent clear guidance from the Supreme Courts of first Kentucky and then Tennessee. And I think it's the same reason that this court should refrain from doing so here with the other 20 states at issue. The appellants point to no state court authority whatsoever recognizing, much less suggesting that the court would even consider recognizing this new duty. And far from it, as our briefs... Illinois case. Well, Your Honor, Illinois presents an interesting question because Mr. Bograd raised the Dolan decision, and I think the first question that you asked was, well, what state court decisions do you have? I think Dolan suffers from a few problems. First, I think it does exactly what this court cautioned in Smith, Strayhorn, Combs, a federal court shouldn't do. It recognized a duty where the state appellate courts hadn't previously done so. So that's problem number one. But problem number two, frankly... But again, that can't be a flat-out preclusion because they're supposed to be predicting, right? Well, Your Honor, I think even if that's not a preclusion, if you look at Dolan itself, I think, frankly, as a matter of Illinois law, it's wrong. And I think that it's contrary to what Mr. Bograd argues, that Dolan somehow is the first line of thinking in Illinois. The Illinois Supreme Court has already spoken on the issue of duty, and specifically, and granted the Dolan court addressed this case, we think it did so incorrectly. But in the Smith v. Eli Lilly case... Dolan wasn't appealed. It's not an appeal, is it? There was a motion for an interlocutory appeal that was denied by the district court judge. The Smith court at the Illinois Supreme Court, I think, speaks to this very issue of what the limits of duty in a product liability case are and are not. And it specifically said, each manufacturer, talking about drug companies, owes a duty to plaintiffs who will use its drug or be injured by it. However, the duty is not so broad as to extend to anyone who uses the type of drug manufactured by a defendant. That's exactly the scenario in which Mr. Bograd is asking you under Illinois to recognize a duty. There is no dispute that his clients took generic products manufactured by separate generic competing companies. They never took a brand name product manufactured by Lilly, Xanadine, or AAI, the three brand defendants in these cases. And the fact, the mere fact, that the brand drug and the generic drug, in theory are bioequivalent under federal law, does not mean that you can therefore impose liability. That's specifically the type of situation Illinois rejected in Smith when it said, just because you make this type of drug, you can't be held liable. So in that respect, Your Honor, I think notwithstanding the fact that Mr. Bograd cites to the Dolan case, it's a federal court decision. It's not a state court decision. In any event, so it's not binding. If federal court decisions as opposed to state court decisions, your number of 80 gets small real quick, right? That number of 80 gets smaller, Your Honor, but the overarching principles stay the same. And I think that's important. Each of these states, if you look at the state appellate authority, they look at these claims and they dismiss, they would dismiss them for two reasons. First, they're all product liability claims. And I think that Judge Sutton, you asked a very important question. You asked Mr. Bograd, what is the misrepresentation at issue here? And while he pointed to a number of statements, all of those statements are contained within the FDA-approved label that by law accompanies the product. The label the brand defendants submit by definition and by law only goes with their product. The label containing the misrepresentations about the generic product is a separate label. It may have the same language, but it is a separate label from separate competing companies that disseminate it with their product. That type of failure to warrant claim is exactly the garden variety traditional product liability claim that's existed for decades under common tort law. And that claim under each of these 22 states, whether it's a drug, whether it's a... The generic misrepresents, so in other words, they're supposed to do the exact same thing. Theoretically, they misrepresent. They don't say the exact same thing. So there's a lie in that sense. Is a state law claim preempted there? The only claim, the only remedy is under federal law because you're supposed to follow the duty of sameness and that's how you deal with that? Or would state law claims exist? Well, Your Honor, that's... Admittedly, that's an issue that my colleague addressed. I think that that would be a question that comes up under this Court's Fulgenzi decision as to whether the generic manufacturer could or could not be liable and whether preemption did or did not exist. But I don't think either way it would affect... I think it illustrates the difference in the labels that in fact the brand manufacturer only controls its label, it only controls its product, but I don't think it creates liability. A question about one claim that meant one person against one company, the Dickerson claim. Yes, Your Honor. The District Court judge dismissed that because Mrs. Dickerson didn't adequately plead that her husband used that drug. I don't think that's true when you look at the complaint. Isn't that a problem? I know it's just one claim. Your Honor, I think that Dickerson... The plaintiffs now argue that Dickerson is the one plaintiff who may have ingested brand product. And I think that may... Wait, wait, no, doesn't it say used Darbyshire? In the complaint, I believe it alleges used Darbyshire, brand and or generic Darbyshire over a long undefined period of time without any substantiation. Now, importantly, the judge gave every plaintiff in this litigation the opportunity to conduct a limited product identification discovery to prove whose product it was. That opportunity was made available to Plaintiff Dickerson and even after that opportunity, Plaintiff Dickerson still could only state brand and or generic product manufactured by both the brand defendants and the generic defendants. And what the court said in that specific instance was that... Did it say and or? I'm not seeing that in what's in front of me. I think it may have said and, Your Honor, but in either event, it essentially said, I took product manufactured by anyone who has ever occupied this space. And the court held that that wasn't sufficiently plausible to identify the particular manufacturer necessary to support the particular product identification or product liability claim at issue. And so the court dismissed those claims on Twombly and Iqbal grounds. Your Honor, I see that my time has expired. If I could have a few seconds to sum up. Yeah, take 30 seconds. As I've said, Your Honor, this case is straightforward. I think that Smith and Strayhorn provide the exact roadmap. There is no difference between the state common law or statutory law of any of the other 20 states at issue. When deciding Smith and Strayhorn, this court said it was relying on the overwhelming majority of cases to reject brand name liability in this context. That majority has only grown stronger and larger since Smith and Strayhorn. And for those reasons, we would respectfully request that this court affirm the decision below. The position is clear. Thank you, Ken. I'll attempt to be brief, Your Honor. I appreciate your indulgence. Let me start with the parallel misbranding issue. What footnote 4 says is we do not address state design defect claims that parallel the federal misbranding statute. Mr. Lefkowitz can read what he wants into the FDA's brief and pure design defect and the like. That's not what the Supreme Court said. And logically, it doesn't make any sense. If federal law prohibits the sale of a product, it can't be impossible for a defendant to comply with the state law duty not to sell the same product. I also think it's important to understand the context of the 2009 review. This was not a case where the company had come to the government and asked the FDA to evaluate the safety of the product. This was an outside citizen petition filed by a private advocacy group. So the question that was before the court was whether to pull a product from the market over the strong objection of all the manufacturers. It clearly was concerned. The advisory committee was concerned. It ordered changes to the labeling and ordered studies and ordered research. Obviously, it did not pull the product from the market at that moment. There will be factual— What's your response on the updating claim in terms of causation? I'm glad you asked that, Your Honor. That was where I was heading next. I'm sorry. May I say one more thing about the design defect claim before I leave it? Justice Stevens in Wyeth v. Levine makes an important point, which is that the FDA's view about whether something is misbranded is not conclusive because under federal law, most misbranding cases are resolved by juries and that therefore the issue of whether something is misbranded is actually a jury question, just as the issue of whether it's unreasonably dangerous would be. Turning to the question you just posed, Your Honor, if you look at the Alex complaint in paragraph 56, that plaintiff at least specifically identifies by month each time she got a prescription filled with generic propoxyphene including a whole bunch of descriptions after July 2009. If you look at paragraphs 131 and 262 and 263, she explicitly alleges causation and reliance. Could the phrasing in some of those paragraphs be more eloquent? No doubt. We were trying to write very large, essentially almost a master complaint, but the paragraphs are there, the allegations are there. Clearly the allegation that none of the companies... You had all the information to do the causation, right? You were not at an informational disadvantage on that point. That's correct, Your Honor, and we allege that it was causative. I don't think that more is required than to say they didn't make this labeling change, they didn't provide this information. Had they provided this information, the doctor would not have prescribed the drug. I mean that's a short and plain statement of the claim for relief. I think to suggest that Iqbal and Twombly require more than that when we've clearly alleged a specific warning that was not added to the product by any of the generic drug company defendants, we've done enough. Now, will we ultimately prevail? Will we be able to establish causation? Those are questions for summary judgment or for trial, but we've clearly made that allegation. I'd also note, Your Honor, in her concurrence and dissent in the Strayhorn case, Judge Stranch pointed out that in her view, because Fulgenzi was decided after the district court had dismissed the cases at issue there, she would have granted leave to amend. We have likewise indicated in the brief that if the court is of the view that in any respect those allegations are insufficient because Fulgenzi was decided after the district court's rulings, that the court could well grant us leave to amend to plead that claim more clearly, though I think we've done it sufficiently already. Lastly, turning to the brand claims. First, Mr. Dickerson, who Judge Sutton, you specifically asked about, started taking Darvon and Darboset in 1970. The only manufacturer of the product from 1970 to 1985 was Eli Lilly. So there is no question that he adequately alleged, and he alleges that he took it for 38 years from 1970, so there is no question that he alleged use by Eli Lilly. Eli Lilly's real argument in the district court was that because he hadn't taken the product after 1992, once Lilly sold the NDA, that they couldn't be held liable because the effects aren't cumulative. The district court properly recognized that that was a disputed issue effect and they could not take judicial notice of it. I think Dickerson is an easy case where the allegation of use was made and should properly survive. The Illinois case that Mr. Bullock talked about in the Illinois Supreme Court was a product liability case, and what the court said is the failure to warrant obligation does not extend to a manufacturer of a comparable but different product. He keeps wanting to characterize this as a brand new cause of action. It's not. It's classic black-letter tort law misrepresentation claims. We think the law in the black-letter tort law, not on these facts, but the black-letter tort law in all these cases clearly points in the direction of recognizing misrepresentation. Black-letter tort law that you're referring to is outside the product liability context. Correct, Your Honor. I'm talking about misrepresentation liability along the lines of 310 and 311 of the Second Restatement of Torts. You asked a question, Your Honor, about the absence of cases like this historically. You have to remember that until 2011, everyone thought they could sue the generic drug company when they were injured by a generic drug product. So as, again, Judge Stranch recognized and Judge Murphy in the Eighth Circuit recognized, and I think it was Bell or Fullington, I can't remember which now. Mensing changed the game, and the issue of having someone else that was potentially liable became a more serious concern when that defendant was off the table. And I should note, as we did in the brief, that the Foster case from the Fourth Circuit, which is sort of the granddaddy decision on the brand defendant's side of the question, itself assumed that generic drug companies could change their label themselves and would be responsible for making sure that their label was adequate. So the entire underpinning of the case law rejecting this is gone. Lastly, I would just mention that Wyeth v. Weeks, the Alabama Supreme Court decision that we cite and have talked about, was itself before the Alabama Supreme Court on certification from an Alabama federal district court. As I said, that court at least recognized that the best way to get the true answer about what state law would be was to ask the highest state court. Judge Reeves said he wasn't going to do it, not because the law was clear, but because it would delay things too much in the district court. It's a pretty discretionary kind of decision, isn't it? It certainly is, Your Honor. We have not argued it was an abuse of discretion, but we clearly think the better course would have been certification, and I believe that in most of these states that course is open to this court as well. Thank you, Your Honor. We appreciate it. The case will be submitted. You may adjourn the court.